STATE OF MAINE                                          SUPERIOR COURT
CUMBERLAND, ss.                                         CIVIL ACTION
                                                        DOCKET NO. CV-00-289
WILLIAM E. LELAND,          APR 6  4 23 PM '01          REC -CUM-4/6/2001

                Plaintiff

                                                        ORDER ON
        v.                                              MOTION TO DISMISS

STATE OF MAINE,
KEVIN CURRAN, ROBERT FLINT
and MICHAEL KASPEREEN,

                Defendants


## FACTUAL BACKGROUND

On May 9, 1998, Trooper Kevin Curran stopped plaintiff William Leland's minivan and the three motorcycles accompanying it for speeding. Trooper Curran detained all four persons until Trooper Robert Flint arrived to conduct a videotaped interview of each person. Trooper Curran also requested that a drug dog be brought to the scene to examine the vehicles and personal belongings of the detainees. Approximately one hour after the initial stop, Trooper Michael Kaspereen arrived with his canine. The dog inspected the individuals, their belongings and the interior of the plaintiff's van, uncovering the presence of marijuana in the vehicle.

On May 5, 2000, the plaintiff filed a five-count complaint against the State of Maine and the three troopers individually and in their official capacities. Counts I, II, III and V allege that the State of Maine and the troopers violated federal and state civil rights laws. Count IV alleges that the defendants invaded the plaintiff's right of privacy and intruded upon the plaintiff's physical and mental solitude and seclusion. Defendants State of Maine and Trooper Michael Kaspereen seek a

dismissal of the plaintiff's complaint in its entirety as to the State and Counts I, II, III, and V as to Trooper Kaspereen in his official capacity. For the following reasons, the defendants' motion is granted.

## DISCUSSION

### I. Civil Rights Claims

Suit against the State of Maine and Trooper Kaspereen in his official capacity is inappropriate under 42 U.S.C.A. § 1983. That section provides

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C.A. § 1983 (West Pamph. 2000) (emphasis added). Neither the State of Maine nor Trooper Kaspereen in his official capacity[1] are "persons" for purposes of § 1983. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). Accordingly, dismissal of Counts I and II as against the State and Trooper Kaspereen in his official capacity is appropriate.

The State of Maine and Trooper Kaspereen, in his official capacity, are also entitled to dismissal of Counts III and V under the Maine Civil Rights Act ("MCRA"). The MCRA, patterned after § 1983, "provides a private cause of action for violations of constitutional rights by 'any person.' " Jenness v.Nickerson, 637

---

[1] Section 1983 does not bar suit against a state officer in his personal capacity for damages arising from his official acts, however. See Hafer v. Melo, 502 U.S. 21, 23 (1991). State officials are "persons" within the meaning of § 1983 when sued in their individual capacities. Id. at 31.

A.2d 1152, 1158 (Me. 1994); see also 5 M.R.S.A. § 4682 (Pamph. 2000). In Jenness, 637 A.2d at 1158, the Law Court held that a State is not a person within the meaning of the MCRA. Trooper Kaspereen is also not a "person" for purposes of the MCRA because the suit against him in his official capacity is "no different from a suit against the State itself." Will, 491 U.S. at 71. Therefore, the MCRA claims against both the State and Trooper Kaspereen in his official capacity must be dismissed.

Citing Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998), the plaintiff argues that there are two exceptions to immunity for governmental entities: (1) if the governmental entity's policy is the "moving force" behind the alleged violation; and (2) where the injury results from a failure to train governmental employees. Both these exceptions apply only to local governments, however, because they are "persons" within the meaning of § 1983 and may therefore be sued directly. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690 (1978). Because this case is a suit against the State of Maine and not a local government, neither exception to immunity applies.

## II. Maine Tort Claims Act

The Maine Tort Claims Act provides that "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages. When immunity is removed *by this chapter*, any claim for damages shall be brought in accordance with the terms of this chapter." 14 M.R.S.A. § 8103 (1980) (emphasis added). The statutory exceptions to governmental immunity are set forth in 14 M.R.S.A. § 8104-A (Supp. 2000). That section permits governmental liability for

negligent acts or omissions in (1) its ownership, maintenance or use of vehicles, machinery and equipment; (2) the construction operation or maintenance of any public buildings; (3) the discharge of pollutants; and (4) its performance of road construction, street cleaning or repair. Id. The statute does not provide an exception to the State's immunity for the stop, detention or search of a motorist or a motor vehicle.

The entry is

Defendants' motion to dismiss the complaint in its entirety as against the State of Maine is GRANTED.

Defendants' motion to dismiss Counts I, II, III and V of the plaintiff's complaint as against Trooper Kaspereen in his official capacity is GRANTED.

Dated at Portland, Maine this 6th day of April, 2001.

Robert E. Crowley
Justice, Superior Court

4

Date Filed  05-05-00  CUMBERLAND  Docket No.  CV 00-289
County

Action  CIVIL RIGHTS

WILLIAM E. LELAND

dismissed 4-6-01.
~~STATE OF MAINE~~, KEVIN CURRAN
ROBERT FLINT
MICHAEL KASPEREEN

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| LEONARD I. SHARON ESQ  782-3275<br>PO BOX 3130, AUBURN ME 04212 | LEANNE ROBBIN, AAG (STATE & TROOPER KASPERI<br>6 STATE HOUSE STATION      CURRAN & FLINT)<br>AUGUSTA, MAINE 04333-0006<br>626-8800 |

| Date of Entry | |
|---|---|
| 2000<br>May 9 | Received 05-05-00:<br>Complaint Summary Sheet filed. |
| "    " | Complaint and Request for Jury Trial filed. |
| "    " | Jury Fee $300.00 PAID. |
| June 07 | Received 06/07/00:<br>Defendant's Motion to Dismiss filed. |
| ""    "" | Memorandum of Law in Support of Motion to Dismiss State of Maine and Trooper Michael Kaspereen in His Official Capacity filed. |
| ""    "" | Defendant Michael Kaspereen's Answer to Complaint filed. |
| June 12 | Received 06-09-00:<br>Summons filed showing officer's return of service on May 22, 2000 upon defendant, Michael Kaspereen. |
| "    " | Summons filed showing officer's return of service on May 19, 2000 upon defendant, State of Maine. |
| June 26 | Received 6-26-00.<br>Plaintiff's motion to extend time for filing response to defendant's motion to dismiss filed. |
| June 28 | On 6-28-00:<br>As to Motion to Extend Time for Filing Response to Defendants Motion to Dismiss, the motion is hereby Granted for reason set forth therein. Response is due July 12, 2000. No Objection. (Mills, J.)<br>Copy mailed to Leonard Sharon and Leanne robbin, Esqs. |
| July 6 | Received 7-5-00.<br>Plaintif's response to defendant, Kaspereen's, motion to dismiss filed. |
| Aug. 15 | Received 08-15-00:<br>Acknowledgment filed showing Acceptance of Service on August 3, 2000 upon defendants, Kevin Curran and Robert Flint. |

STATE OF MAINE                                    SUPERIOR COURT
CUMBERLAND, ss.                                   CIVIL ACTION
                                                  DOCKET NO. CV-00-289


WILLIAM LELAND,

                Plaintiff,

v.                                                ORDER ON MOTION
                                                  FOR SUMMARY JUDGMENT


STATE OF MAINE, MAINE                             DONALD L. GARBRECHT
STATE TROOPERS KEVIN                              LAW LIBRARY
CURRAN, ROBERT FLINT and
MICHAEL KASPEREEN,                                SEP 9 2002

                Defendants.


        Defendants Kevin Curran, Robert Flint, and Michael Kaspereen filed a

motion for summary judgment as to all of the counts of the plaintiff's complaint

asserting they did not interfere with or violate the plaintiff's constitutional or civil

rights, and they are entitled to both qualified and discretionary immunity. Upon

examination of the defendants' motion, the plaintiff's opposition, and the applicable

law, the defendants' motion will be granted.


                                **BACKGROUND**

        The plaintiff's complaint arises out of facts attending a traffic stop made by

Trooper Curran. Trooper Curran first noticed the plaintiff and his associates at a rest

stop where, he testified, he witnessed one of the group - who appeared to have

noticed the trooper - make a motion upon exiting the restaurant, after which the

group returned to the restaurant. Trooper Curran did not include this observation

in his report on the traffic stop. Subsequently, Trooper Curran used radar to assess the speed of the van driven by the plaintiff and determined that the plaintiff was traveling approximately 72-75 miles per hour in a zone posted with a maximum allowable speed of 65 miles per hour. Trooper Curran pulled the plaintiff over. The plaintiff was driving a van. His three associates, who were driving three separate motorcycles, also pulled over. Trooper Curran witnessed the plaintiff get out of his van, and instructed the plaintiff to return to the van, which the plaintiff did. Trooper Curran questioned the plaintiff and his three associates. The four men gave conflicting stories about where they were going. According to the plaintiff, this conflict was attributable to the fact that he had changed his mind about the destination, but he had not told all of the others. Trooper Curran called for back-up because of the size of the group, and Trooper Flint arrived shortly thereafter. Trooper Curran called in an inquiry to the Department of Motor Vehicles (DMV) and received a response that the plaintiff was a member of the Hell's Angels Motorcycle gang and that the plaintiff was confrontational, but received the additional caveat "Warning, C-I-C violent gang and terrorist organizations filed information does not furnish grounds for the search or seizure of any individual vehicle logged." Trooper Flint interviewed each of the men, and also received conflicting accounts regarding their destination. Trooper Curran then called for a K-9 unit, which arrived about an hour after the initial stop. Trooper Flint did not participate in the decision to call for the K-9 unit, and he did not discuss with Trooper Curran what observations led to Curran calling for the K-9 unit. The K-9

2

unit sniffed the four men and "hit" on the plaintiff and one other of the men. The K-9 unit conducted an "external sniff" of the van. Trooper Curran testified that the dog indicated the presence of a controlled substance, but the plaintiff testified that the dog made no indication. The plaintiff denied the troopers access to the van. The troopers let the dog into the interior, despite the plaintiff's refusal to consent, and the dog "hit" on the ashtray and the floor between the front seats. A search warrant for the van was obtained and a search was conducted, which search resulted in some marijuana being found. At some point during the stop, the plaintiff said that he had been near someone smoking marijuana, but claimed in his deposition that he was joking and that he does not use marijuana.

There are facts in conflict as to whether Trooper Flint conveyed the results of his questioning to Trooper Curran. During the course of the stop, the plaintiff and his associates were frisked three times. Once, after the dog had "hit" on the plaintiff and one other of the men, the other man was asked to pull down his pants while he was by the side of the road.

The plaintiff brought the subject lawsuit and asserts: a claim for damages under 42 U.S.C. § 1983 for violation of his Fourth and Fourteenth Amendments (Count I); a claim for damages under 42 U.S.C. § 1983 for violations of the First and Fourteenth Amendments (Count II); a claim under the Maine Civil Rights Act, 5 M.R.S.A. § 4681 et seq., for the same behavior complained of in Counts I and II (Count III); a claim under the Maine Tort Claims Act, 14 M.R.S.A. § 8101 et seq., for excessive detention, unlawful search of his person, belongings, associates and

3

vehicle causing humiliation, emotional distress, annoyance, property damage, and invasion of the plaintiff's right of privacy (Count IV); and a claim under the Maine Civil Rights Act for unlawful, malicious, and forcible detention and deprivation of liberty without any authority to do so causing humiliation, annoyance, and mental anguish (Count V).

## DISCUSSION

Summary judgment is appropriate if the record reflects that there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. M. R. Civ. P. 56(c); Saucier v. State Tax Assessor, 2000 ME 8, ¶ 4, 745 A.2d 972, 974.

As a preliminary matter, as to Counts I and II, the defendants request summary judgment to the extent those claims are based on the Maine Constitution, and on the defendants' alleged negligence. See Baker v. McCollan, 443 U.S. 137, 146 (1979) (42 U.S.C. § 1983 does not cover official conduct violating only state law); see also 728 F. Supp. 804, 806 (D. Me. 1990) (negligent conduct cannot support a § 1983 claim). The court agrees that to the extent the plaintiff grounds Counts I and II in state law and negligence, there is no basis for recovery.

I.    Counts I and II - 42 U.S.C. § 1983/Fourth, First and Fourteenth Amendments

"'A public official claiming qualified immunity . . . must establish either that he or she did not violate the plaintiff's rights or that given the state of the law a reasonable official would not have understood that he [or she] was doing so.'"

4

Munjoy Sporting & Athletic Club v. Dow, 2000 ME 141, ¶ 18, 755 A.2d 531, 539-40 (quoting Andrews v. Dep't of Envtl. Prot., 1998 ME 198, ¶ 11, 716 A.2d 212, 217). The First Circuit, in evaluating a claim of qualified immunity, established the following sequential analysis:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001) (citations omitted). This order of analysis is intended to protect the acting official from having to defend a lawsuit.[1] Id. at 142. "A right is clearly established if 'the contours of the right [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right[; t]he unlawfulness must be apparent in light of preexisting law.'" Munjoy Sporting & Athletic Club v. Dow, 2000 ME 141, ¶ 18, 755 A.2D 531, 540. The defendants argue that they are entitled to summary judgment because they can establish that they did not violate the plaintiff's rights, they did not violate the plaintiff's clearly established rights, and that a reasonable official would not have understood that he was violating the plaintiff's rights.

A.    Violation of the plaintiff's Fourth Amendment Rights

---

[1] The United States Supreme Court has written that "[a]n officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances[; i]f the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense." Saucier v. Katz, 533 U.S. 194 (2001). The same concept is applicable in the present inquiry.

5

The defendants crafted their arguments in terms of the different stages of the traffic stop and investigatory detention. For clarity, the court will analyze the arguments in the same stages.

1.  The initial stop

In general, "the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996) (citations omitted). The acting official's subjective intent alone "does not make otherwise lawful conduct illegal or unconstitutional." Id. at 813. "[P]robable cause justifies a search and seizure." Id. at 819.

Here, there is no dispute that Trooper Curran used radar to assess the speed of the plaintiff's vehicle, and determined that the plaintiff was traveling at between 72 and 75 miles per hour in a zone posted with a maximum allowable speed of 65 miles per hour. There is no dispute that the plaintiff was traveling in excess of 65 miles per hour at the time he was pulled over. There is no dispute that pursuant to 29-A M.R.S.A. § 2074(3-A), a person who operates a vehicle at a speed in excess of 65 miles per hour commits a traffic infraction. Accordingly, the court concludes that Trooper Curran had probable cause to stop the plaintiff's vehicle, and that the plaintiff's Fourth Amendment rights were not violated by the initial stop.

2.  The investigative stop (initial detention)

The Law Court has written: "An investigatory stop is valid when it is 'supported by specific and articulable facts which, taken as a whole and together with

6

the rational inferences from those facts, reasonably warrant the police intrusion.'" State v. Bolduc, 1998 ME 255, ¶ 5, 722 A.2d 44, 45 (quoting State v. Taylor, 1997 ME 81, ¶ 9, 694 A.2d 907, 909). A civil violation is sufficient to create such "specific and articulable facts." Id. There is no dispute that the plaintiff was traveling in excess of 65 miles per hour at the time he was pulled over. There is no dispute that pursuant to 29-A M.R.S.A. § 2074(3-A), a person who operates a vehicle at a speed in excess of 65 miles per hour commits a traffic infraction. The initial investigatory detention, then, was valid. Accordingly, the plaintiff's Fourth Amendment rights were not violated by the initial stop.

        3.     The investigatory stop (the one hour investigative stop, K-9 search)

Where an initial stop is determined to be valid, the legitimacy of continued detention is evaluated by deciding "whether the actions taken by the officer following the stop were reasonably responsive to the circumstances justifying the stop in the first place, as augmented by information gleaned by the officer during the stop." United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998) (citation omitted); see also Illinois v. Wardlow, 528 U.S. 119, 126 (2000) ("The *Terry* stop is a far more minimal intrusion, simply allowing the officer to briefly investigate further[; i]f the officer does not learn facts rising to the level of probable cause, the individual must be allowed to go on his way"). In making this determination, the court is asked to balance the nature and quality of the intrusion against the importance of the governmental interests alleged to justify the intrusion. Id. (citing United States v.

7

Hensley, 469 U.S. 221, 228 (1985)). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." Illinois v. Wardlow, 528 U.S. at 123-24 (2000) (quoting Terry v. Ohio, 392 U.S. 1, 27 (1997)); see also United States v. Sokolow, 490 U.S. 1, 8-9 (1989) ("innocent behavior will frequently provide the basis for a showing of [reasonable suspicion] and . . . in making a determination of [reasonable suspicion] the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts") (citation and internal quotations omitted).

The First Circuit has noted that:

> The Supreme Court has directed courts making this inquiry to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.

United States v. Owens, 167 F.3d 739, 749 (1999) (citation and quotation omitted).

In Sowers,[2] the First Circuit affirmed the district court's conclusion that the

---

[2] In Sowers, Trooper Curran pulled the defendant over after observing that the exhaust system was particularly loud, and that there was no front license plate. Sowers, 136 F.3d at 25. The defendant provided his license, and the registration of the vehicle, which listed the owner as "Tammy Gayton." Id. In response to Trooper Curran's questioning, the passenger said that she was Tammy Gayton, but admitted that she had no identification with her. Id. Trooper Curran separated the defendant and the passenger and questioned them as to the details of their travels, about which he received conflicting answers. Id. Even after receiving confirmation of the passenger's identity, and being informed that the defendant's license was valid, Trooper Curran was suspicious and detained them. Id. Trooper Curran requested permission to search the vehicle, which Tammy Gayton originally denied, but

officer's level of suspicion escalated in response to new information collected during the course of the valid stop - the passenger's inability to confirm her identity, the excessive nervousness of the driver and passenger, and the conflicting stories offered by the driver and passenger as to the extent, purpose, and details of their travels. Sowers, 136 F.3d at 27. The district court determined, and the First Circuit affirmed that, faced with such mounting suspicion, the officer's continued detention of Sowers was not a violation of Sowers' Fourth Amendment rights.[3] See also United States v. Sokolow, 490 U.S. 1, 8-9 (1989) (finding reasonable suspicion where the defendant travelled under an alias, took an evasive path through an airport, paid in excess of $2000 cash for two airplane tickets, and travelled for 20 hours to spend 48 hours in Miami). In United States v. Owens, 167 F.3d 739 (1st Cir. 1999), the First Circuit concluded that the approximately 50 minute wait for the arrival of the drug dog was not unreasonable where the offciers continued to investigate during

---

eventually granted when Trooper Curran informed her that he would summon a narcotics dog to perform a sniff search. Id.

[3] The First Circuit wrote:
To sum up, the Supreme Court has cautioned that reasonable suspicion, like probable cause, is not amenable to technical formulations that purport to identify the precise types of conduct or sets of circumstances that will or will not permit a police officer to stop and detain an individual. To the contrary, the Justices have looked favorably upon a practical, common sense approach to the issue of reasonable suspicion. Viewing the facts of this case in a down-to-earth manner, we conclude that the district court did not err in finding that [the officer] had adequate justification to prolong the stop beyond the point at which Sowers produced his papers and thereafter beyond the point at which [the passenger's] identity was nominally corroborated.
Sowers, 136 F.3d at 28 (citations omitted).

the wait. Owens, 167 F.3d at 748-49 (based on conflicting answers given by driver and passenger, the officers called for a drug dog, which took about 50 minutes to arrive from the airport; additional factors confirming illicit activity occurred *after* drug dog was requested).

In this case, Curran asserts that he too had "mounting suspicions" based on the plaintiff's membership in a motorcycle gang, the fact that plaintiff prematurely exited his vehicle (from which Trooper Curran could infer that the plaintiff did not want him to approach the van interior), and the fact that the plaintiff and his associates gave conflicting information about their destination. After the call for the drug dog was made, Troopers Curran and Flint conducted pat down searches on the plaintiff and his associates, and Trooper Flint also interviewed the men.

On these facts it is not unreasonable to believe that the evidence cited would be insufficient to justify Trooper Curran's suspicions, and to justify the continued detention of the plaintiff while waiting for the drug dog to arrive. The combination of reported membership in a motorcycle gang and conflicting information as to destination does not reasonably lead one to the conclusion that illegal activity was afoot, unlike Sowers where the nervousness of the parties contributed to the suspicions of the officer. Groups of motorcyclists often go for a ride just to go for a ride, and the court can conceive that the members of a group would defer to one member as to route and destination, unlike Sowers, where both parties were in the same car and yet gave conflicting information.

Assuming that this evidence was insufficient to justify Curran's "mounting

10

suspicions," the court concludes that the plaintiff's Fourth Amendment rights were not so clearly defined in the preexisting law that Officer Curran would have known that detaining the plaintiff for one hour under these circumstances was a violation of those rights. Although the printout from the DMV indicated that membership in a gang was not sufficient to justify a search, the printout did not indicate that the membership could not be *considered* as a factor in making the decision to detain. In addition, according to preexisting law as set out in the Sowers opinion, the fact that parties traveling together give conflicting information as to details of travel is a valid factor in deciding to detain the parties. The court cannot conclude that the difference between the evidence cited in Sowers (inability to confirm passenger identity, nervousness of detainees, conflicting information) and the evidence in the present case (membership in motorcycle gang, premature exit from vehicle, conflicting information) is so clear that Trooper Curran should have been aware that to detain the plaintiff for one hour was a violation of his Fourth Amendment rights. Accordingly, the defendants[4] are entitled to qualified immunity as to Count I.

B.    Violation of the plaintiff's First Amendment rights

The plaintiff argues that the defendants were motivated by a desire to chill the plaintiff's protected right to associate with whomever he chooses. The plaintiff cites Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994) to support the proposition that the

---

[4] Trooper Curran was in charge of the scene and investigation, and was the primary actor; if his actions are entitled to immunity, Troopers Flint and Kaspereen are also entitled to immunity.

11

plaintiff need not prove that the motivation to chill the protected right was the *sole* motivation of the officers. <u>Tatro</u>, 41 F.3d at 18 ("the plaintiff need not prove that the defendant's *sole* motive was to chill the plaintiff's protected expression[; t]he plaintiff need only show that the officer's intent or desire to curb the expression was the *determining* or *motivating* factor in making the arrest, in the sense that the officer would not have made the arrest 'but for' that determining factor").[5]

Under the holding of <u>United States v. Rubio</u>, 727 F.2d 786 (9th Cir. 1984), when First Amendment protected activity is implicated in a criminal investigation, the First Amendment inquiry collapses into the Fourth Amendment analysis.[6] <u>Rubio</u>, 727 F.2d at 791 (when First Amendment interests would be implicated by a search, the courts must apply the warrant requirements with "particular exactitude") (quoting <u>Zurcher v. Stanford Daily</u>, 436 U.S. 547 (1978)); <u>Burke v. City of Portland</u>, 2000 WL 761799 (D. Me) (in the context of a First Amendment claim, the court asked

---

[5] <u>Compare</u> <u>Whren v. United States</u>, 517 U.S. at 809 ("regardless of whether a police officer subjectively believes that the occupants of an automobile may be engaging in some other illegal behavior, a traffic stop is permissible as long as a reasonable officer in the same circumstances *could have* stopped the car for the suspected traffic violation").

[6] In <u>Rubio</u>, the defendants were charged with conspiring to participate in the conduct of the affairs of the Hell's Angels Motorcycle Club, an enterprise, through a pattern of racketeering activity in violation of the RICO statute. <u>Rubio</u>, 727 F.2d at 790. The defendants asserted that warrants, authorizing search and seizure of "indicia of membership in or association with the Hell's Angels Motorcycle Club," were facially invalid as violative of the defendants' First Amendment right to free association. <u>Id.</u> at 791. The United States Court of Appeals for the Ninth Circuit agreed that membership in the Hell's Angels was protected by the First Amendment, but concluded that "[w]hen activity protected by the First Amendment becomes the subject of a criminal investigation, the protections afforded by the Fourth Amendment come into play." <u>Id.</u>

12

only whether the officers had probable cause to arrest the plaintiff); San Jose Charter of the Hell's Angels Motorcycle Club v. City of San Jose, 1999 WL 1211672 (N.D. Cal.) (adopting the holding of Rubio even where the plaintiffs were not criminal suspects when their houses were searched); United States v. Robinson, 1998 WL 322656 (6th Cir.) (unpublished) (affirming decision to suppress evidence seized where the *only* indicia of criminal activity was membership in a motorcycle gang; the court specifically noted that there was "no knowledge of [the d]efendant's criminal history, . . . no direct evidence that [the defendant] possessed drugs or weapons . . . no nervousness [on the part of the defendant], and . . . [no] inconsistent stories"). To hold otherwise would be to give additional Fourth Amendment rights based solely on membership in certain organizations. Therefore, having already concluded that the defendants are entitled to qualified immunity as to the plaintiff's Fourth Amendment claim, the court's inquiry is complete. The plaintiff's assertion of a First Amendment violation under the present facts will not lie.

II.     Counts III, IV, and V - Maine Civil Rights Act and Maine Tort Claims Act

The plaintiff has also asserted state law claims under the Maine Civil Rights Act (Counts III and V) and the Maine Tort Claims Act (Count IV). The defendants assert that they are protected by discretionary immunity (Count IV) and qualified immunity (Counts III and V).

A.     Maine Tort Claims Act

Government officials are given immunity for their discretionary acts under the Maine Tort Claims Act. 14 M.R.S.A. § 8111. "An act qualifies as a discretionary

function if the act is essential to the realization or accomplishment of a basic governmental policy program or objective, and requires the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental employee involved." Selby v. Cumberland County, 2002 ME 80, ¶ 7, 796 A.2d 678, 680 (internal quotation and citations omitted). The enforcement of traffic laws and criminal drug laws is a basic governmental objective. Curran's "duties included enforcement of the highway traffic laws, and he was called on to exercise his judgment in deciding what actions to take in enforcement of those laws." Id. In addition, as Curran's suspicions were aroused during the course of the traffic stop, he was called upon to exercise his judgment in deciding what actions to take in enforcing Maine's drug laws.

"A governmental official will not be shielded from liability . . . for actions that so *clearly exceed* the scope of he official's authority that the official cannot be said to be acting in an official capacity." Id., 2002 ME 80, ¶ 6 n.5, 796 A.2d at 680. Here, the court has already concluded that a reasonable officer, in Curran's position, would not have understood that what he was doing violated the plaintiff's rights. Accordingly, the court concludes that Trooper Curran was *not* acting beyond the scope of his authority to the extent that he should lose his discretionary immunity. As a result, the defendants are entitled to discretionary immunity as to the plaintiff's claim under the Maine Tort Claims Act (Count IV).

B.      Maine Civil Rights Act

In Jenness v. Nickerson, 637 A.2d 1152, 1153 (Me. 1994), the Law Court noted

14

that because the Maine Civil Rights Act is patterned after 42 U.S.C. § 1983, the same qualified immunity analysis that is applicable to § 1983 actions is also applicable to claims under the Maine Civil Rights Act. See also Hegarty v. Somerset County, 53 F.3d 1367, 1373 n.3 (1st Cir. 1995). Having concluded that the defendants are entitled to qualified immunity under the plaintiff's § 1983 claims, the court now agrees with the defendants that they are entitled to qualified immunity as to the plaintiff's claims under the Maine Civil Rights Act. Although not endorsing the actions of Trooper Curran, the court does not believe that a reasonable officer would have known that his actions violated the plaintiff's clearly established rights, *as the law stood at the time of the complained of actions.*

The entry is

Defendants' motion for summary judgment as to Counts I-V is GRANTED.

Dated at Portland, Maine this 6th day of August 2002.

_____
Robert E. Crowley
Justice, Superior Court

Date Filed __05-05-00__ __CUMBERLAND__ Docket No. __CV 00-289__
County

Action __CIVIL RIGHTS__

WILLIAM E. LELAND

dismissed 4-6-01.
~~STATE OF MAINE~~, KEVIN CURRAN
ROBERT FLINT
MICHAEL KASPEREEN

vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| LEONARD I. SHARON ESQ  782-3275<br>PO BOX 3130, AUBURN ME 04212 | LEANNE ROBBIN, AAG (STATE & TROOPER KASPEREF<br>6 STATE HOUSE STATION    CURRAN & FLINT)<br>AUGUSTA, MAINE 04333-0006<br>626-8800<br><br>WILLIAM FISHER AAG (Kevin Curran, Robert<br>6 STATE HOUSE STATION Flint, Michael Curran)<br>AUGUSTA ME 04333 626-8800 |