NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-277

COMMONWEALTH

vs.

CHRISTOPHER MERCED.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This appeal arises from the defendant's conviction in the Essex Superior Court, following a jury trial, of one count of trafficking in 200 grams or more of cocaine, G. L. c. 94C, § 32E (b).[1] On appeal, the defendant argues that his conviction should be vacated because (1) Massachusetts State Police troopers engaged in extensive illegal conduct during the course of an investigatory traffic stop; (2) the Commonwealth negligently lost exculpatory video evidence; and (3) an expert witness for the Commonwealth improperly testified as to the ultimate question before the jury. We discern no error and affirm the judgment.

---

[1] The defendant was acquitted of one charge of furnishing a false name, G. L. c. 268, § 34A.

1.  Troopers' conduct.[2]  The defendant first argues that State troopers (1) improperly subjected him to a pretextual stop, (2) illegally questioned him, (3) illegally ordered him to exit his vehicle, (4) arrested him without probable cause, and (5) searched his vehicle without probable cause.  For these reasons, the defendant argues that all evidence collected against him should have been suppressed.  After careful review, we discern no misconduct on the part of the troopers and no error by the motion judge.

a.  Preserved errors.  "In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error and leave to the judge the responsibility of determining the weight and credibility to be given . . . testimony presented at the motion hearing" (citation omitted).  Commonwealth v. Daveiga, 489 Mass. 342, 346 (2022).

_____

[2] In September and October 2017, Massachusetts State Police, alongside Federal authorities, investigated possible narcotics distribution in Lawrence.  For purposes of the present appeal, that investigation came to a head on October 18, when Trooper Tirella watched the defendant enter an apartment and depart twenty-five minutes later, carrying a rectangular object in a plastic bag.  After following the defendant, Trooper Tirella contacted Trooper Traister, who was on patrol in a marked vehicle, and asked him to join the surveillance and, as the defendant conceded during oral argument, to stop the defendant if he could lawfully do so.  Trooper Traister eventually conducted a traffic stop, and, alongside other troopers, discovered bundles weighing a total of 490 grams and containing cocaine inside a hidden compartment in the defendant's vehicle.

"We review independently the application of constitutional principles to the facts found" (citation omitted).  Id.

"Where a police officer has a reasonable, articulable suspicion that a person has committed, is committing, or is about to commit a crime, the officer may stop that person to conduct a threshold inquiry."  Commonwealth v. Bostock, 450 Mass. 616, 619 (2008), citing Terry v. Ohio, 392 U.S. 1, 21-22 (1968).  "Where a law enforcement officer performs an investigatory stop, that officer's level of intrusiveness must be in proportion to the officer's suspicion or concern for safety."  Commonwealth v. Manha, 479 Mass. 44, 48 (2018).  See Bostock, supra at 622.  "If an officer exceeds the scope of an investigatory stop, the seizure becomes an arrest."  Manha, supra.  "Whether a stop is a seizure, requiring reasonable suspicion, or an arrest, requiring probable cause, depends upon the circumstances of each case."  Id.  "The existence of probable cause depends on whether the facts and circumstances within the officer's knowledge at the time of making the search or seizure were sufficient to warrant a prudent man in believing that the defendant had committed, or was committing, an offense."  Commonwealth v. Hernandez, 473 Mass. 379, 383 (2015), quoting Bostock, supra at 624.

Here, we discern no impropriety on the part of the State troopers with respect to the stop, questioning, arrest, or

3

search of the defendant or his vehicle.  At the outset, we note that Trooper Traister's stop of the defendant's motor vehicle was supported by his observation that the defendant committed a number of motor vehicle infractions, including (1) entering the left passing lane and traveling within that lane for approximately one mile, (2) drifting over marked lanes, and (3) traveling closely behind another vehicle.  Any one of these violations was sufficient to justify a traffic stop.  G. L. c. 89, §§ 4A, 4B; 720 Code Mass. Regs. § 9.06(1), (2), (7) (2017).  See Commonwealth v. Buckley, 478 Mass. 861, 873 (2018) ("[T]he reasonableness of a traffic stop does not depend upon the particular motivations underlying the stop. . .  [L]egal justification alone, such as an observed traffic violation, is sufficient").  That Trooper Traister expected to find narcotics in the vehicle as a result of the information provided to him by Trooper Tirella is of no moment.  Id.  See also Commonwealth v. Santana, 420 Mass. 205, 208-209 (1995) ("Police conduct is to be judged under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved" [quotation and citation omitted]).

The defendant further argues that Trooper Traister improperly ordered him to exit his vehicle during the stop. Trooper Traister had collected the defendant's driver's license and was returning to his patrol vehicle when he saw the

4

defendant reaching around in the back seat of his vehicle.  On observing this behavior, Trooper Traister immediately ordered the defendant to exit his vehicle.  Coupled with the trooper's knowledge that the defendant was the subject of a separate investigation and his earlier observations that the defendant (1) was nervous and excessively sweaty and (2) had lied about his point of origin, Trooper Traister was justified in his concern that the defendant's reaching into the back seat of his vehicle without any apparent reason for doing so created a safety risk for both of them.[3]  See Commonwealth v. Torres-Pagan, 484 Mass. 34, 38 (2020) ("[A]n exit order is justified during a traffic stop where [1] police are warranted in the belief that the safety of the officers or others is threatened; [2] police have reasonable suspicion of criminal activity; or [3] police are conducting a search of the vehicle on other grounds").  We discern no impropriety in the trooper's decision to order the defendant to exit his vehicle.

The defendant next argues that he was arrested without probable cause when Trooper Traister placed him in the back of his patrol vehicle prior to discovering contraband.  We are not persuaded.  In addition to the suspicious behavior discussed

---

[3] Trooper Traister testified that after he ordered the defendant to exit the vehicle, he saw a metal baseball bat in the area where the defendant had been reaching.

5

supra, Trooper Traister had been informed by Trooper Tirella that the defendant was the subject of a separate investigation. Trooper Traister's seizure of the defendant was lawful pursuant to his investigation of the defendant's suspected narcotics transportation.  See Manha, 479 Mass. at 48.  This knowledge was sufficient to justify detaining the defendant while awaiting the arrival of a K-9 unit.[4]  Id.

Finally, the defendant argues that the search of his vehicle was without probable cause.  This argument is meritless. The use of a K-9 to detect the odor of narcotics is not a search requiring probable cause.  See Commonwealth v. Feyenord, 445 Mass. 72, 82-83 (2005).  Once the K-9 signaled the presence of narcotics, the troopers had probable cause to search the

_____

[4] The defendant argues that the thirty-five minute wait between the initial stop and the arrival of the K-9 unit further supports the conclusion that he was arrested without probable cause.  Again, we are not persuaded.  "When evaluating whether a detention during an investigatory stop is of such length that it should be deemed an arrest, it is appropriate to 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'" Commonwealth v. Sinforoso, 434 Mass. 320, 325 (2001), quoting United States v. Sharpe, 470 U.S. 675, 686 (1985).  The use of a K-9 to check for the odor of narcotics was "a less intrusive alternative to a full search of the vehicle," Sinforoso, supra at 324, and we discern no impropriety in detaining the defendant for thirty-five minutes while awaiting the K-9 where he was the subject of a separate investigation, was behaving in a nervous manner, reached in the vicinity of a weapon before being removed from the vehicle, and was repeatedly deceptive about his point of origin.  See id. at 325-326.

6

vehicle.  Id. at 83.  "Under the automobile exception to the warrant requirement, the search of a motor vehicle [wa]s reasonable and permissible."  Hernandez, 473 Mass. at 383, quoting Commonwealth v. Johnson, 461 Mass. 44, 49 (2011).

b.  Unpreserved error.  For the first time on appeal, the defendant also argues that troopers engaged in custodial interrogation without providing him with the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966).  Because the defendant did not raise this claim in his motion to suppress, we review for a substantial risk of miscarriage of justice.  Commonwealth v. Letkowski, 469 Mass. 603, 617 (2014); Commonwealth v. Alphas, 430 Mass. 8, 13 (1999).  We discern no substantial risk here.

Ordinarily, "[Terry-type vehicle] stops are permissible where an officer has a reasonable suspicion that a crime has been, is being, or is about to be committed."  Commonwealth v. Cawthron, 479 Mass. 612, 616 (2018).  "At that point, the interaction is casual, and generally no Miranda warnings are necessary."  Id.  "At some point, however, the nature of the interaction may change, as officers begin to focus on a particular suspect."  Id.  "Miranda warnings require that police officers inform suspects of their right[s] . . . before a custodial interrogation" (quotation and citation omitted).  Id. at 616-617.  "An interview is custodial where 'a reasonable

7

person in the suspect's shoes would experience the environment in which the interrogation took place as coercive.'" Id. at 617, quoting Commonwealth v. Larkin, 429 Mass. 426, 432 (1999).

The defendant argues that, because of the conversation between Troopers Tirella and Traister before Trooper Traister conducted the traffic stop, the defendant was a suspect at the outset of the stop and should have been given Miranda warnings immediately. The cursory questioning conducted by troopers during the traffic stop and now challenged by the defendant did not rise to the level of custodial interrogation requiring Miranda warnings. See Cawthron, 479 Mass. at 617-618. However, even if the troopers' questioning constituted custodial interrogation and required Miranda warnings that were not provided, we nevertheless discern no substantial risk of miscarriage of justice. See Letkowski, 469 Mass. at 617. Aside from asking for the defendant's license and registration and casually greeting him by saying "Hey, man, what's going on," the only questioning in which the troopers engaged was to ask the defendant about his point of origin. When the defendant provided an answer inconsistent with the location of the stop, Trooper Traister repeated the question a single time. Trooper Cain repeated the question for a third time separately and did not press when the defendant declined to speak further. That the troopers asked these questions without providing Miranda

8

warnings did not create a substantial risk of miscarriage of justice.  See id.

2.  Video evidence.  The defendant further argues that all indictments should have been dismissed prior to trial because the Commonwealth lost exculpatory video evidence.  In the alternative, he seeks a new trial in which all evidence obtained from the video evidence is excluded.  During trial, the defendant raised the issue of the lost evidence by asking for a jury instruction, which the trial judge provided in a form that was satisfactory to the defendant at the time.  We discern no error on the part of the trial judge.

During the investigation into the defendant's activities, Massachusetts State Police placed a "covert" camera on a nearby utility pole and used it to discretely observe an apartment building that they suspected was being used for narcotics distribution.  Testimony at trial indicated that the camera was set to automatically delete unsaved footage after thirty days, and that, although some images had been saved, portions of the video were not retained.

As a result, during a discussion about jury instructions, the defendant requested a spoliation instruction to deal with the lost evidence.  The next day, the judge told counsel that he intended to give a "missing evidence instruction" pursuant to his understanding of Commonwealth v. Heath, 89 Mass. App. Ct.

9

328 (2016).  He explained that, having considered the analytical framework described in Heath, he concluded that such an instruction was the proper remedy.  After having provided that instruction to the defendant for review, the trial judge asked counsel for the defendant if there was "anything you wish to say about the rulings I've made and the instructions I've indicated that I will give in response to the respective requests of counsel?"  Counsel for the defendant responded, inter alia, "[your instructions] pretty much mirror my thoughts" and "what you've expressed and what you've done is, quite frankly, what we could have asked for."

"The defendant did not object to the instruction at trial, and for that reason, the claims he now raises on appeal are not preserved. . . .  We therefore review to determine whether an error occurred and, if so, whether that error created a substantial risk of a miscarriage of justice" (quotation and citations omitted).  Commonwealth v. Garcia, 94 Mass. App. Ct. 91, 98-99 (2018).  See Mass. R. Crim. P. 24 (b), 378 Mass. 895 (1979).

In determining whether an error occurred, we review for an abuse of discretion.  See, e.g., Commonwealth v. Meas, 467 Mass. 434, 448 (2014).  As the Supreme Judicial Court explained in Meas, supra,

10

"A defendant who seeks relief from the loss or destruction
of potentially exculpatory evidence has the initial burden
. . . to establish a reasonable possibility based on
concrete evidence rather than a fertile imagination that
access to the [evidence] would have produced favorable
evidence to his cause.  If the defendant meets this initial
burden, then the judge, or the court on appeal, must
proceed to balance the Commonwealth's culpability, the
materiality of the evidence, and the prejudice to the
defendant in order to determine whether the defendant is
entitled to relief" (quotations and citations omitted).

"[Massachusetts] courts have fashioned or upheld various
judicial remedies for the loss of evidence, and we leave it to
the trial judge to determine in the first instance the remedy to
be applied if . . . some sanction is required" (quotations and
citations omitted).  Commonwealth v. Kee, 449 Mass. 550, 557
(2007).

Here, after the defendant raised the issue, apparently for
the first time, during the charging conference, the trial judge
found that the defendant met his threshold burden and told the
parties he would take time to research the appropriate course of
action.  The next day, he provided proposed jury instructions to
both parties, including an instruction addressing missing
evidence that was intended to resolve the issue.[5]  The trial

---

[5] With respect to the question of missing evidence, the trial
judge eventually told the jury:
"When the Commonwealth had the ability to gather and
produce particular evidence that would have been helpful to
the jury's fact finding in the case and it failed to do so,
you may infer, but you are not required to do so, that the
evidence that was not produced would have been unfavorable
to the Commonwealth.  It may be possible to draw more than

11

judge specifically asked defense counsel if they were satisfied with the instruction, to which counsel for the defendant answered affirmatively.  Because we discern no error or abuse of discretion as to the trial judge's remedy, we likewise discern no risk of miscarriage of justice.  See Kee, 449 Mass. at 557.

3. Expert testimony.  Finally, the defendant argues that an expert witness for the Commonwealth impermissibly testified as to the ultimate question of the defendant's guilt.  We are not persuaded.

The defendant concedes that he did not object to the expert witness's testimony at trial and "[u]npreserved claims of error are reviewed only to determine if they created a 'substantial risk of miscarriage of justice.'"  Commonwealth v. Saulnier, 84 Mass. App. Ct. 603, 607 (2013), quoting Commonwealth v. Freeman, 352 Mass. 556, 563-564 (1967).

"A qualified narcotics expert is permitted to offer an opinion based upon a hypothetical 'grounded in facts in evidence, as being "consistent with" a drug transaction.'"  Commonwealth v. Acosta, 81 Mass. App. Ct. 836, 842 (2012), quoting Commonwealth v. MacDonald, 459 Mass. 148, 162 (2011).  Questions based on previously-admitted evidence may be posed to

one inference from the failure to preserve and produce such evidence, and choosing between any such competing inferences is exclusively your prerogative."

12

an expert witness to gain his opinion on that evidence, "even if the witness's reply thereby touches on the ultimate issue of the case. The only limitation is that the subject matter discussed be within the witness's field of expertise and that the witness not _directly_ express his views on the defendant's guilt" (emphasis added). Commonwealth v. Tanner, 45 Mass. App. Ct. 576, 579 (1998). See also Mass. G. Evid. § 704 (2019). Ultimately, the issue in such cases is whether the expert witness opinion testimony is "_explanatory_. . . . So long as expert testimony is directed to that purpose, it is admissible" (emphasis added). Tanner, supra at 581.

Here, Sergeant Conant did not testify as to his conclusion regarding the ultimate issue, but rather explained, in response to a hypothetical and based on his expertise, why he thought the narcotics in the hypothetical were intended for distribution. See Tanner, 45 Mass. App. Ct. at 579. He offered this assessment based on the quantity and packaging of the narcotics. He further discussed characteristics of the apartment used as a distribution point and explained in detail why these factors led him to assess the evidence as consistent with the distribution of narcotics.[6] This testimony addressed the hypothetical put

---

[6] He testified, inter alia, that the quantity of cocaine in question was too great to be intended for personal use, and that it seemed to be packaged for distribution to mid or low-level drug dealers. He further testified that the scales and other

before him and did not directly address the defendant's guilt. Without more, we cannot conclude that this testimony gave rise to a substantial risk of miscarriage of justice.  <u>Id</u>.

<u>Judgment affirmed</u>.

By the Court (Sullivan,
  Desmond & Singh, JJ.[7]),

*Joseph F. Stanton*

Clerk

Entered:  July 5, 2023.

---

materials were consistent with the packaging of illegal drugs, and the sparse furnishment and the fortification of the apartment suggested that it was used as a "stash location."
[7] The panelists are listed in order of seniority.